UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS W. THOMPSON, JR.,          :
   Petitioner,          :
        :   CIVIL NO. 1:10-CV-2227
   v.          :
        :   (Judge Caldwell)
DANIEL BURNS, et al.,          :
   Respondents          :

*M E M O R A N D U M*

I.  *Introduction*

   In January 2005, a jury in the Court of Common Pleas of York County,

Pennsylvania, found the pro se petitioner, Thomas W. Thompson, Jr., guilty of attempted

criminal homicide, aggravated assault, arson and possession of explosive/incendiary

materials or devices.  The convictions resulted from an arson fire that was set at the

residence of Timothy Thompson and Ellen Thompson, husband and wife, and their son,

Bradley Thompson.[1]  In March 2005, Petitioner was sentenced to ten- to twenty-years

imprisonment on the charge of attempted criminal homicide with the other counts

merging for sentencing purposes.

   Thompson is challenging his conviction under 28 U.S.C. § 2254 and makes

the following claims.  First, trial counsel was ineffective in not objecting to prosecutorial

misconduct in his closing argument when the prosecutor: (1) argued that Petitioner had

---

[1] Petitioner is not related to the victims.

disappeared from his family and had run from the police when the record did not support

these allegations and in fact the record shows no disappearance occurred; (2) argued

that Petitioner was untruthful, and the Commonwealth's witnesses were truthful, based

on the amount of eye contact the witnesses made with the jury; and (3) made an

argument that ridiculed defense counsel's knowledge of the facts while attesting to the

veracity of the Commonwealth's witnesses.  As part of this claim, Petitioner argues that

these incidents of prosecutorial misconduct "taken together" undermined the fairness of

the trial and contributed to a miscarriage of justice.

    Second, trial counsel was ineffective in not objecting to the trial court's

instructions to the jury which: (1) improperly told the jury they could find Petitioner guilty

of homicide simply upon a finding of malice; (2) told the jury all four offenses rose or fell

upon whether Petitioner set the fire; (3) instructed on first-degree murder when Petitioner

was not charged with first-degree murder; and (4) told the jury that the intentional setting

of a fire near a dwelling could on its own establish an intent to kill.  Taken as a whole,

these instructions on attempted homicide improperly relieved the Commonwealth of the

burden of establishing beyond a reasonable doubt that Petitioner acted with the specific

intent to kill.

    Third, trial counsel was ineffective in not conducting a reasonable

investigation into whether Bradley Thompson had set the fire.  Fourth, the evidence was

insufficient to establish the offense of attempted homicide when there was no evidence

that Petitioner knew there were individuals inside the residence or that he specifically intended to murder the occupants as a result of the fire.

Petitioner took a direct appeal.  The Pennsylvania Superior Court affirmed his conviction in an unpublished opinion.  *Commonwealth v. Thompson*, No. 717 MDA 2005 (Pa. Super. Ct. July 12, 2006), and the Pennsylvania Supreme Court denied a petition for review in a one-line order.  *Commonwealth v. Thompson*, No. 612 MAL 2006 (Pa. Dec. 27, 2006).  Petitioner also sought collateral relief under state law by way of a petition under the Pennsylvania Post Conviction Relief Act (PCRA).  42 Pa. Con. Stat. Ann. §§ 9541-9546 (West 2007 & Supp. 2011).  The trial court denied relief and the superior court affirmed in an unpublished opinion.  *Commonwealth v. Thompson*, No. 1149 MDA 2008 (Pa. Super. Ct. Dec. 15, 2009).  The Pennsylvania Supreme Court then denied a petition for review in a one-line order.  *Commonwealth v. Thompson*, No. 193 MAL 2010 (Pa. Aug. 11, 2010).

II.   *Standard of Review*

Our habeas review of the state courts' resolution of Petitioner's claims is governed by 28 U.S.C. § 2254(d)(1) and (d)(2).  Under subsection (d)(1), we may grant the writ if the state courts' adjudication of the claims was contrary to clearly established Supreme Court precedent or an unreasonable application of that precedent.  A state court judgment is "contrary to" Supreme Court precedent when it is "diametrically different, opposite in character or nature, or mutually opposed" to "clearly established" decisions of the United States Supreme Court. *Williams v. Taylor,* 529 U.S. 362, 405-06,

120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000).  "A state-court decision will also be contrary to" Supreme Court "precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the] precedent."  *Id.* at 406, 120 S.Ct. 1519-20.

"[A] state court ruling is considered an 'unreasonable application' if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply."  *McMullin v. Tennis,* 562 F.3d 231, 236 (3d Cir. 2009)(cited cases omitted).  "The unreasonable application test is an objective one-a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly."  *Jacobs v. Horn,* 395 F.3d 92, 100 (3d Cir. 2005)(cited cases omitted).  If "'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief cannot be granted.  *Harrington v. Richter,* __ U.S. __, __, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011)(quoted case omitted).

Under subsection (d)(2), we may grant the writ if the state courts' adjudication of the claims "resulted in a decision that was based on a unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In addition, the claims of ineffective assistance of counsel are governed by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance,* 556 U.S. 111, 123, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009).  Thus habeas review of a *Strickland* claim is "doubly deferential."  *Id.*, 129 S.Ct. at 1420.

III.  *Background*

The trial testimony was as follows.  At around 3:40 a.m. on December 9, 2003, an arson fire was set at the Thompsons' home.  At that time, Timothy Thompson, Ellen Thompson and their son, Bradley Thompson, were asleep in the residence.

The house sits in a north-south direction with its front  facing east.  There is a small backyard with an underground tank that stores propane gas used to heat the house.  There is a gap in the backyard fence, which allows a delivery person entry to fill the tank.  An underground line runs from the tank to the southwest corner of the house.  At that point, the line comes out of the ground, enters the house and connects to the furnace.  The line also has a valve or regulator on it where it comes out of the ground. (Doc. 12-1, CM/ECF pp. 67-68).[2]

At this corner of the house, there is also a basement room, where Timothy Thompson kept a quantity of gunpowder for making his own bullets.  The furnace was in this room.  (*Id.*, CM/ECF p. 68).  The room has a basement window with a window well.

---

[2]    The page numbers used are the page numbers assigned by the Case Management/Electronic Case Files (CM/ECF) system.

(*Id.*, CM/ECF pp. 68-69).  The window opens from the inside.  (*Id.*, CM/ECF p. 90).  The other room in the basement was Bradley Thompson's bedroom.  (*Id.*).  Both of the rooms have doors.  (*Id.*).

Further north on the back of the house Bilco-type doors allow entry to the basement.  (*Id.*, CM/ECF p. 69).  The house has a detached two-car garage on the northern part of the property.  Ellen Thompson parks her car in the garage, and her husband and son park theirs in the driveway.  (*Id.*, CM/ECF p. 66).  The garage was where the lawnmower was filled if it needed gasoline.  (*Id.*, CM/ECF p. 69).

Ellen Thompson testified that around 3:40 a.m. on December 9, 2003, she was awakened by the smell of wood smoke.  As she checked the house, she entered the basement.  The smell was constant all through the house but "was a little stronger in the basement."  (*Id.*, CM/ECF p. 71).  She entered her son's basement bedroom, where he was in bed, (*id.*), sleeping.  (*Id.*, CM/ECF p. 89).  She woke him up.  (*Id.*).  As she testified, "And I think I asked him if he smelled anything.  And I thought I had smelled some gas.  I thought maybe he had gotten gas and spilled some on his shoes."  (*Id.*, CM/ECF p. 71).  She walked to the other basement room (where the gunpowder was kept) and saw through the window in that room "the fire, the flames in the window well." (*Id.*, CM/ECF pp. 71-72).  She ran outside and threw snow on the flames, which put the fire out.  (*Id.*, CM/ECF pp. 72, 73).  Her son hooked up the garden hose and wet down the wall and the corner of the house.  Still, "there were smoke curls coming out between" the seams in the siding, which was made of asbestos but might have appeared to be

6

wood.  The smoke was "coming out the bottom, curling out the bottom of the siding." (*Id.*, CM/ECF p. 73).  Ellen Thompson also observed that a bucket she had placed over the propane valve or regulator the previous day to protect it from snow melting off the roof was missing.  It was never seen again.  (*Id.*, CM/ECF p. 75).

Ellen Thompson knew Petitioner, who was a friend of her son.  Petitioner has been to her house, the last time being November 2002.  When he came to the house, he would come inside and "walk around."  (*Id.*, CM/ECF p. 81).  He "would have been familiar with the house."  (*Id.*, CM/ECF p. 82).  Timothy Thompson testified that Petitioner had been "in the basement area."  (*Id.*, CM/ECF pp. 138-39).

Bradley A. Schriver, an arson investigator for the Pennsylvania State Police, investigated the fire.  As part of his investigation, he took three samples.  The first sample was of charred leaves and soil from the area of the propane regulator, at the southwest corner of the house.  The second sample was from the area of the Bilco-type doors.[3]  The third sample was from the rear of the house at the opposite corner.  The third sample was a comparison sample, taken because it was not supposed to have any evidence relevant to the investigation.  (*Id.*, CM/ECF p. 113-14, 115).  The first two samples "test[ed] positive for the presence of gasoline."  The third sample "was found to have an ignitable liquid present but below measurable quantities."  (*Id.*, CM/ECF p. 116).  The investigator opined that if the fire had reached the gunpowder or the propane gas, it

---

[3]   The investigator concluded there were two fire areas, one at the southwest corner and other near the basement doors. (*Id.*, CM/ECF p. 110).

would have been "extremely more intense." (*Id.*, CM/ECF p. 118).  He also opined that if

the propane valve had failed, and the gas had ignited, "it would have been a really bad

fire." (*Id.*, CM/ECF p. 119).

Shawn Cuffley was the first police officer to respond.  In part, he testified

that he found a partially burned restaurant-type napkin near the southwest corner of the

house and another partially burned napkin outside the gap in the back fence  (*Id.*,

CM/ECF p. 126-129).

Bradley Thompson testified that at around 3:40 to 4:00 a.m. on December

9, 2003, he was asleep in his basement bedroom, but woke up to the sound of his

mother moving around the house and coming downstairs.  They found the fire at the

southwest corner of the house and put it out.  (*Id.*, CM/ECF pp. 141-42).  Bradley

Thompson had given a written statement to the police in which he said he had been

"lying in bed not sleeping" when his mother came into the basement.  (*Id.*, CM/ECF p.

148).  At trial, he explained this discrepancy by stating that he had been asleep but was

awakened by his mother coming downstairs.  (*Id.*, CM/ECF p. 148-49).

In January 2003, Bradley Thompson testified against Petitioner in a

separate criminal proceeding, where Petitioner was charged with the unauthorized use of

an automobile.  (*Id.*, CM/ECF p. 142; doc.12-2, CM/ECF p. 33).  Petitioner spent about

six months in jail as a result of those proceedings.  (Doc. 12-2, CM/ECF p. 33).  Bradley

Thompson testified that Petitioner expressed his displeasure to him about the testimony.

They stopped being friends after Bradley Thompson's involvement in those proceedings.

(*Id.*, CM/ECF p. 143).  Bradley Thompson saw Petitioner on the night of December 8, 2003, at around 10:00 or 11:00 p.m. at the restaurant where Bradley Thompson worked as a line cook, Damon's in Hanover.  They did not talk.  (*Id.*, CM/ECF pp. 144-46, 149).

Joshua Lefevre, Petitioner's friend at the time, testified that Petitioner stopped by his house at around 9:00 or 10:00 p.m. on December 8, 2003.  Petitioner wanted him to go out to a bar with him, but Lefevre declined.  Petitioner went to Damon's by himself and returned around 11:30 p.m.  According to Lefevre, Petitioner "was pretty drunk.  He was talking about how he wanted to burn down Brad [Thompson's] house because of something Brad said."  Lefevre said Petitioner stated that "[he] wanted to see his [Bradley Thompson's] family living in the Red Cross."  (*Id.*, CM/ECF pp. 168-69).  This was the third or fourth time Petitioner had talked about burning down Thompson's house.  (*Id.*, CM/ECF p. 170).  Petitioner made these statements after he had gotten out of jail on the previous prosecution, between June 2003 and December 8, 2003.  (*Id.*, CM/ECF p. 171).

Lefevre and Petitioner talked again the next day.  Petitioner told him he went to Thompson's house, through the back entrance, "poured gas on the back wall," and "lit it on fire and left."  He said he used matches and napkins.  (*Id.*, CM/ECF pp. 172-73).  He said he was upset with Bradley Thompson because he had "testified against him."  (*Id.*, CM/ECF p. 174).  The defense presented the testimony of two witnesses that Lefevre had a  reputation in the community for being dishonest.  (Doc. 12-2,  CM/ECF pp. 6, 9).

Justin A. Murray was in jail from October 2003 through January 2004. Murray was a friend of Petitioner. He testified that Petitioner visited him in jail on December 20, 2003. Petitioner asked him what jail was like. Petitioner then stated "that he had done something really bad," that "he may have started a fire to someone's house," and "that it was in retaliation to something." (Doc. 12-1, CM/ECF pp. 203–04). In return for his testimony, Murray's term on a probation-violation sentence was shortened from six months to three months. (*Id.*, CM/ECF pp. 200-01).

Jeffrey Knouse, the arresting police officer, testified about a written statement Petitioner had given in connection with the prior criminal matter in which Bradley Thompson testified against him. In the statement, Petitioner asserted that Bradley Thompson had set him up for the charges out of jealousy and rage. The statement blamed no one else. (*Id.*, CM/ECF pp. 227-28).

Amy Nonemaker was involved personally with both Petitioner and Bradley Thompson at relevant times. At trial she testified that she also gave testimony against Petitioner in the prior criminal matter, but Petitioner never expressed any anger against her for doing so. (Doc. 12-2. CM/ECF p. 10). Bradley Thompson was upset with her about her relationship with Petitioner. (*Id.*, CM/ECF p. 11).

She also testified that she and Bradley Thompson were having problems with Stevie Noel, that they owed him money for crack cocaine. Noel was after Bradley for the money. (*Id.*, CM/ECF p. 12). Noel has been in and out of prison a couple of times. Bradley was afraid of him. (*Id.*, CM/ECF p. 14). Noel "is really loud and he's one

to speak his mind.  If he has a problem with you, he'll tell you and approach it." (*Id.*, CM/ECF p. 15).  He has "a reputation for being a loud person." (*Id.*).  Bradley Thompson has avoided places where Noel might be, such as Noel's house and bars he would be at. (*Id.*).

Petitioner testified in his own defense.  He denied telling Bradley Thompson he was displeased about the testimony in the previous criminal matter (*id.*, CM/ECF p. 34).  In fact, he realized being in jail was his own fault, and he tried to contact Bradley after he got out of jail to reconcile.  (*Id.*, CM/ECF p. 35).  Petitioner's father testified that after he got out of jail, Petitioner was still upset about his situation and that his father had advised him to let it go.  (Doc. 12-1, CM/ECF pp. 164-65).

Petitioner denied telling Lefevre he wanted to start a fire at Bradley Thompson's home.  (Doc. 12-2, CM/ECF p. 34).  His relationship with Lefevre was not smooth.  He had a disagreement with Levefre about a $50 drug debt Lefevre owed him, and admitted that he had had a sexual relationship with Lefevre's then girlfriend (now wife), and that Lefevre wanted to fight him.  (*Id.*, CM/ECF pp. 46-48).  He admitted it was possible the subject of the fire came up in his prison conversation with Murray.  (*Id.*, CM/ECF p. 44).  December 9, 2003, was just a regular day for him. (*Id.*, CM/ECF p. 37). He said he was at home sleeping when the fire occurred. (*Id.*, CM/ECF p. 38).  He specifically denied going to the house on December 9 to set a fire to kill Bradley Thompson and his parents.  (*Id.*, CM/ECF p. 52).

Petitioner testified he has been in the Thompson house.  He has been in every room except for the parents' bedroom and the father's "gun room."  (*Id.*, CM/ECF p. 42).  Bradley had told him that was where his father kept his guns.  Petitioner was curious about the room but never entered it because Bradley told him not to.  (*Id.*, CM/ECF p. 42-43).

Petitioner testified he lived at his parents' house from Thanksgiving 2003 through January 3, 2004.  (*Id.*, CM/ECF p. 36).  He moved from his parents' house to Lefevre's house on January 3, 2004.  (*Id.*, CM/ECF p. 58).  He first heard about the fire about three or four days after it happened.  His father or parents would give him a message that the police had called, and this lasted a couple of weeks.  He asked his father why he had to contact the police, and his father did not know.  The next time the police called, they told his father Petitioner was a suspect in a fire.  (*Id.*, CM/ECF pp. 41-42).  On January 6, 2004, when the police were interviewing Joshua Lefevre at Lefevre's house, Petitioner knew the police were there, but stayed in another room.  (*Id.*, CM/ECF pp. 55-56).

On cross-examination, the prosecutor asked about his whereabouts in December 2003:

> Q.  Now, where were you in December of 2003 when you weren't living at your parents' house before –- you testified today, before you moved to Josh Lefevre's house?
>
> . . . .
>
> A.  I was living at my house.

Q.  Do you realize your dad told police he didn't know where you were?

. . . .

A.  He may have told them.

Q.  He may have told them that. . . .

. . . .

Q.  When you first talked to the police a couple of weeks after this incident, you told them that week –- that night I was probably working at Klinger's of Hanover?

A.  I told them I could have been.

Q.  That was before you disappeared from your family for a while?

A.  I never disappeared.

Q.  After you disappeared form your family because your dad didn't know where you were --

A.  He didn't know.

[defense counsel]: His father has never testified to that. He's trying to introduce that through Tom.

[the Court]: It is up to the jury what the witness said.

(*Id.*, CM/ECF pp. 59-60).

In his closing argument, the prosecutor made the following points, in

pertinent part.  First, when a person is telling the truth, he will look at you and thus the

jury should remember where Petitioner's eyes went as he was testifying.  (*Id.*, CM/ECF p.

97).  Second, this was a case of arson based upon the intentional setting of the fire "in

13

the middle of the night while they were sleeping in their beds.  The cars were out in the

driveway.  And it was 3:40 in the morning when they were woken up by the wood smoke

in the house."  It was not only arson but criminal attempt to commit homicide as he was

also trying to "murder them in their sleep without giving any warning . . . ."  (*Id.*, CM/ECF

p. 98).

        Third, when Petitioner knew the police were looking for him, Petitioner

disappeared and "duck[ed]" and "dodg[ed]."

> Now, weeks after this fire when Tom Thompson knew the
> police were looking for him, does he stay at his parents'
> house?  No.  He disappears.  How do we know that?  From
> his own mouth.  He disappears.

(*Id.*, CM/ECF p. 102).

> Number one, let's talk about Justin Murray.  The Defendant,
> Tom Thompson, doesn't dispute he went to visit Justin Murray
> when Justin was in jail.  What time period was this? This is
> when Tom Thompson disappeared from his family.  So,
> during this time that he is on the run, he is missing, he goes to
> visit his old friend, Justin Murray. . . . but you can look at the
> circumstantial evidence of where he was, the fact that he was
> on the run, that he was missing from his parents . . . .

(*Id.*, CM/ECF p. 104, 105).

> Now, Josh Lefevre, you heard the Defendant say, yes,
> before I moved into his house, before I went on the run, I
> would go and hang out at Josh Lefevre's house.

(*Id.*, CM/ECF pp. 106-107).

> But, this was a boy who went to live with somebody after
> running away from his parents for a couple of weeks, after
> ducking and dodging.  And this a person that you then have to
> believe.

(*Id.*, CM/ECF pp. 114-115).

In pertinent part, the court instructed the jury as follows.  First, Petitioner could not be guilty if he was not at the scene of the crime.  All of the charges "rise or fall on the same central factual premise," whether Petitioner had set the fire.  (*Id.*, CM/ECF p. 141).  If the jury found that the Commonwealth had not proven that Petitioner had set the fire, then he is not guilty of any of the offenses.  (*Id.*).  Second, as to attempted homicide:

> So, let me start with the basics.  In order to find the Defendant guilty of attempted homicide, there has to be a finding that the Defendant acted with malice.  And in order to determine he was acting with malice -- that has a special legal meaning.  It does not simply mean hatred, spite or ill will.  It is a shorthand way of referring to the mental state that the law regards as being bad enough to make a killing murder.  And thus, a killing is with malice if the killer acts with the intent to kill, the intent to inflict serious bodily harm, or what is called a wickedness of disposition, a hardness of heart, a cruelty, recklessness of consequences, and a mind regardless of social duty indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life.  Another way of stating it is a conscious disregard of an unjustified and extremely high risk that the actions might cause death or serious bodily harm.

> Now, that definition applies both as to attempted homicide and also aggravated assault.  They both have the requirement that malice exist.  The difference between the two is that for attempted homicide, the intent of the Defendant has to be specifically that he intends to kill, not just that death might have resulted.  It has to be his intent.  That's sort of the hallmark of first-degree murder, that you intend to kill somebody.

15

Now, if you are attempting murder, by definition, that means you had the intent to kill. If you are attempting to kill them, you have that intent. It is another way of saying the same thing. So, that would be sufficient if death had actually occurred to find a verdict of first-degree murder if you find they had the intent to kill.

But, since death didn't actually happen here, what we're talking about is attempt to kill. And that can only be proven by the first element of malice that I spoke of, that is that the person had the intent to kill.

But, in regards to aggravated assault, that requirement of malice would still exist and he would still have to have that same legal status of malice in regard -- with the exception that what would be required would only be the intent to cause serous bodily injury rather than that they have intent to kill.

So, since attempted homicide is essentially a first-degree murder where the person attempted first-degree murder, I will give you the instructions for what would be necessary for first-degree murder, understanding that in this case everything will apply except that the person hasn't actually died.

So, the first requirement would be that the Defendant's conduct was such that he had the specific intent to kill. And that the person has the specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention. So that a killing, for example, would be with a specific intent to kill if it was willful, deliberate, and premeditated. But, the specific intent to kill does not necessarily require planning or previous thought for any particular length of time. It can occur quickly. All that's necessary is that there be time enough so the Defendant can and does fully form an intent to kill and is conscious of that intention. And whether or not a Defendant had the specific intent to kill, in deciding that you should consider all of the evidence regarding his words and conduct and the attending circumstances that may show what his state of mind was.

(*Id.*, CM/ECF pp. 142-45).

16

III.   *Discussion*

A.   *Petitioner Has Failed to Exhaust State-Court Remedies on*
     *Certain Claims and Cannot Show Either Cause and Prejudice*
     *Or a Fundamental Miscarriage of Justice that Would Allow the*
     *Court to Consider the Claims on the Merits*

A federal court cannot grant habeas relief to a section 2254 petitioner imprisoned as a result of a state conviction unless the petitioner has exhausted the remedies "available" in state court on his federal claims.  *See* 28 U.S.C. § 2254(b)(1)(A); *Slutzker v. Johnson,* 393 F.3d 373, 379 (3d Cir. 2004)(citing section 2254(b)(1)(A)).  In the instant case, Petitioner did not exhaust state-court remedies on the following three claims: (1) trial counsel was ineffective in not objecting when the prosecutor in his closing argument: (a) argued that Petitioner was untruthful, and the Commonwealth's witnesses were truthful, based on the amount of eye contact Petitioner and the witnesses made with the jury; and (b) ridiculed defense counsel's knowledge of the facts while attesting to the veracity of the Commonwealth's witnesses; (2) trial counsel was ineffective in not objecting to the trial court's jury instructions which: (a) told the jury all four offenses rose or fell upon whether Petitioner set the fire; (b) instructed on first-degree murder when Petitioner was not charged with first-degree murder; and ©) told the jury that the intentional setting of a fire near a dwelling could on its own establish an intent to kill; and (3) trial counsel was ineffective in not conducting a reasonable investigation into whether Bradley Thompson had set the fire.

The first two claims have not been exhausted because they were never presented to the state courts.[4]  The third claim has not been exhausted because, while it was presented to the state trial court during Petitioner's PCRA proceedings (Doc. 12-4, PCRA petition, ¶ 4(e); Doc. 12-4, CM/ECF pp. 8, 32), Petitioner did not pursue that claim on his appeal to the superior court.[5]  Exhaustion requires that the petitioner present his claims to each level of the state courts.  *Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000).[6]

When "further state-court review is clearly foreclosed under state law, exhaustion is excused on the grounds of futility."  *Wenger v. Frank,* 266 F.3d 218, 223 (3d Cir. 2001).  Exhaustion is therefore excused for Petitioner's unexhausted claims because it would be futile for him to return to the state courts for an adjudication of these claims.  He could only litigate them by way of a PCRA petition, *Commonwealth v. Watts*,

---

[4]  Petitioner argues that he did present the ineffectiveness claim relating to the prosecutor's remarks about the credibility of witnesses and defense counsel's knowledge of the facts.  We agree as to the credibility of the witnesses to the extent that the claim is that the prosecutor improperly vouched for the credibility of the Commonwealth witnesses, (Doc. 12-4, CM/ECF p. 50).  We disagree with Petitioner as to the other claims.

[5]  Neither did he pursue the ineffectiveness claim relating to the prosecutor's supposed vouching.

[6]  Parenthetically, on a Pennsylvania conviction the petitioner need not go to the level of the state supreme court because Order 218, an administrative order from the Pennsylvania Supreme Court, has made review in the state supreme court "unavailable for purposes of exhausting state court remedies . . . ."  *Boyd v. Waymart*, 579 F.3d 330, 368 (3d Cir. 2009)(quoted case and internal quotation marks omitted).

23 A.3d 980, 983 (Pa. 2011), and the state courts would not accept another PCRA

petition for at least one reason.  Any petition filed now would be time-barred.[7]

These claims are deemed exhausted only because Petitioner committed a

procedural default of the claims in state court.  So that section 2254 petitioners do not

avoid the exhaustion requirement by failing to present their claims in state court, *see*

*O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999),

federal courts do not consider procedurally defaulted claims if the state courts' refusal to

entertain them is based on an independent and adequate state-law ground.  *See Lark v.*

*Secretary Pennsylvania Dep't of Corr.*, 645 F.3d 596, 611 (3d Cir. 2011).  The one-year

period of limitations for filing PCRA petitions is an independent and adequate state-law

ground.  *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

There are two exceptions to this rule.  Federal courts can evaluate the

merits of procedurally defaulted claims if the petitioner shows either: (1) cause and

prejudice; or (2) a fundamental miscarriage of justice.  *See Lines, supra,* 208 F.3d at

166.  Petitioner argues he satisfies both of these standards.  We disagree.

---

[7]   A PCRA petition must be filed within one year of the conviction's becoming final. 42 Pa. Con. Stat. Ann. § 9545(b)(1)(West 2007).  In relevant part, a conviction "becomes final at the conclusion of direct review . . . or at the expiration of time for seeking [direct] review," "including discretionary review in the Supreme Court of the United States."  *Id.* § 9545(b)(3). Direct review concluded on March 27, 2007, the expiration of the ninety-day period for seeking discretionary review in the Supreme Court.  Thus, the one-year PCRA limitations period expired on March 27, 2008.  Under Pennsylvania law, this period is considered jurisdictional and cannot be extended by the court.  *Commonwealth v. Bennett*, 593 Pa. 382, 388, 930 A.2d 1264, 1267 (2007).  There are statutory exceptions, but they do not apply here.  *See* section 9545(b)(1)(i)-(iii).

To demonstrate "cause" for a procedural default, the petitioner must show that some objective factor external to the defense impeded petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986); *Leyva v. Williams,* 504 F.3d 357, 366 (3d Cir. 2007). To demonstrate "prejudice," the petitioner must show "not merely that the errors created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting the entire proceeding with error of constitutional dimensions." *See United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982).

Petitioner argues he satisfies the cause prong of the cause-and-prejudice test because his PCRA counsel was ineffective in not pursuing these claims and because the trial court denied him a full and fair PCRA hearing. These reasons are insufficient to establish cause. As noted, cause must be something "external" to the defense that impeded the attempt to raise the claim in state court. Ineffective assistance of counsel can be such cause when it occurs at the time of trial and on direct appeal as of right under the theory that the state, which is "external" to the defense, must supply effective counsel under the Sixth Amendment. *Murray, supra,* 477 U.S. at 488, 106 S.Ct. at 2645. However, a defendant has no Sixth Amendment right to counsel in postconviction proceedings, *Cristin v. Brennan*, 281 F.3d 404, 420 (3d Cir. 2002), so ineffective assistance of PCRA counsel is not enough to establish cause. *Id.*

In the circumstances of this case, neither can cause be based on the alleged failure of the trial court to provide a full and fair PCRA hearing. Our review of the

PCRA record indicates that the trial court did entertain all the claims Petitioner presented.  (Doc. 12-4, CM/ECF pp. 12-303).  In any event, as it relates to cause for excusing procedural default, the problem for Petitioner is not the trial court but his PCRA appellate counsel's decision not to pursue these claims on appeal, a failure that is not external to the defense.[8]  Because Petitioner has failed to establish cause, we need not examine the prejudice prong of the test.

The fundamental-miscarriage-of-justice exception is a claim of actual innocence.  *See House v. Bell*, 547 U.S. 518, 537, 126 S.Ct. 2064, 2077, 165 L.Ed.2d 1 (2006).  To satisfy this exception, "a petitioner must demonstrate two things . . . . First, a petitioner must present new, reliable evidence that was not presented at trial.  *Schlup* [v. Delo], 513 U.S. [298,] 324, 115 S.Ct. [851,] 865, [130 L.Ed.2d 808 (1995).  Second, a petitioner must show by a preponderance of the evidence, "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.  *Id.* at 327, 115 S.Ct. at 867."  *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010).  The court examines not just the new evidence but the old evidence as well.  *House*, 547 U.S. at 538, 126 S.Ct. at 2077.

Petitioner argues we can consider these claims because he is actually innocent of the charges against him.  He asserts that Bradley Thompson was the real perpetrator, relying on the following, in pertinent part.  Bradley owed Stevie Noel money

---

[8]   We do not criticize that counsel for not raising these claims on appeal.  Indeed, a decision not to pursue these claims appears to be well within the range of competent decision-making by counsel.

for crack cocaine.  He had previously spent money he had received in an insurance

settlement on drugs.  (Doc. 12-4, PCRA transcript, CM/ECF pp. 130-31).  He was afraid

of Noel, avoiding places where he might be.  Bradley gave a statement to the police that

conflicted with his trial testimony.  In the statement, he said he was lying in bed awake on

the night of the fire, but at trial he said he was asleep and was awakened by his mother's

coming downstairs.  He also smelled of gasoline, according to his mother's testimony,

who also testified that the smell of wood smoke was stronger in the basement.  There

was an ignitable liquid in a soil sample taken from the northwest corner of the house,

along with the gasoline found at the Bilco-type basement doors and at the southwest

corner of the house.  The gun room's window opens from the inside.  The smoke was

curling away from the siding.  Bradley Thompson's basement bedroom had two posters.

One read "Are You A Walking Time Bomb" and the other read "Help Us Stop Satanists

From Opening the Gates Of Hell."  (Doc. 12-4, PCRA transcript, CM/ECF p. 128).

Based on the foregoing, Petitioner argues that Bradley Thompson set fire

to the house and that Petitioner is innocent.  According to Petitioner, Bradley set the fire

to kill his parents.  His motive was to inherit his parents estate as their only child so that

he could pay his drug debt to Noel, of whom he was afraid.  The other evidence shows

that Bradley did in fact set the fire.  He was awake in his basement bedroom at the time

of the fire (according to his police statement), and he smelled of gasoline.  The smoke

was strongest in the basement, where the window closest to the fire only opened from

the inside, indicating that someone in the basement had opened the window.  The

ignitable liquid in a soil sample taken from the northwest corner of the house indicates the gasoline was obtained from the garage, located at the northern end of the house, because this establishes a trail from the garage to the basement doors and the southwest corner of the house, the locations where the two samples of gasoline were found.

We conclude Petitioner has failed to meet the miscarriage-of-justice exception.  First, Petitioner's argument in all material respects is based on the trial record, not new evidence.  The only new evidence is Bradley Thompson's having previously spent money he had received in an insurance settlement on drugs and the posters on his bedroom wall.  Neither piece of evidence tends to show that Bradley Thompson set the fire, and Petitioner makes no attempt to say why.

Second, Petitioner has misstated the record in one important respect.  He asserts that Bradley Thompson smelled of gasoline on the night of the fire.  Nothing in the record supports that.  His mother testified that she "thought maybe he had gotten gas and spilled some on his shoes" as her initial reaction to smelling gasoline in the house. She never testified that he in fact smelled of gasoline.  Without the smell, he is just another occupant of the house lying in bed.

Third, Petitioner unreasonably infers that Bradley Thompson would murder both his parents because he was afraid of Stevie Noel.  Bradley Thompson may have been afraid of Noel but not enough for a reasonable juror to conclude that he would murder his parents so he could pay his drug debt to Noel.  Bradley Thompson's fear of

Noel is based on the testimony of Amy Nonemaker, who said Noel was a "really loud" person who "speak[s] his mind" and who will tell you if he has a problem with you. People do not murder their parents so that they can avoid an unpleasant verbal confrontation.

These two defects in Petitioner's argument defeat his claim of actual innocence.  In fact, the claim borders on the absurd.  Moreover, in assessing Petitioner's actual-innocence claim, we must consider all the evidence.  That evidence includes testimony at trial from two witnesses that Petitioner admitted setting the fire.  We thus cannot conclude that it is more likely than not that no reasonable juror would have convicted Petitioner in the light of the new evidence, assuming that it was new.  It follows that we cannot consider his procedurally defaulted claims.  We turn now to those that have been properly exhausted.

> B. *The State Courts' Decision that the Evidence Was Sufficient*
> *to Establish the Offense of Attempted Homicide Was Not*
> *Contrary To, Or an Unreasonable Application of, Supreme*
> *Court Precedent*

We begin with Petitioner's fourth claim, that the evidence was not sufficient to establish the offense of attempted homicide when there was no evidence that Petitioner knew Bradley Thompson and his parents were inside the residence at the time of the fire.  Petitioner argues that the absence of this evidence means that the Commonwealth failed to prove an essential element of the crime, that he specifically intended to murder the occupants by setting the fire.

The parties do not cite a Supreme Court case directly on point and we are unable to locate any.  We will resolve this claim under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which sets forth the clearly established federal standard for dealing with claims that the evidence is not sufficient to support the conviction.  *See Johnson v. Mechling*, __, F. App'x __, __, 2011 WL 4565464, at *7 (3d Cir. 2011)(nonprecedential)(relying on *Jackson* to resolve a federal habeas claim challenging the sufficiency of the evidence).  We must decide if the state courts unreasonably applied *Jackson* to Petitioner's case.

Under *Jackson*, the evidence must be viewed in the light most favorable to the prosecution, and the claim must be rejected if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.  The court is not to make its own subjective determination of guilt or innocence.  *Id.* at 319 n.13, 99 S.Ct. at 2789 n.13.  Circumstantial evidence is sufficient.  *Id.* at 324-25, 99 S.Ct. at 2792.

Under Pennsylvania law, "[a] person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being."  18 Pa. Con. Stat. Ann. § 2501(a)(West 1998).  A person attempts to commit a crime "when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime."  18 Pa. Con. Stat. Ann. § 901(a)(West 1998).  Thus attempted criminal homicide occurs when a person takes a substantial step toward killing another individual and acts with the specific intent to kill.

25

*See Commonwealth v. Robertson*, 874 A.2d 1200, 1207 (Pa. Super. Ct. 2005).  Specific

intent can be inferred from the circumstances, *id.*, for example, from the use of a deadly

weapon to inflict injury on a vital part of the body.  *Id.*[9]

>        As noted earlier, we must examine the last reasoned state-court decision

on this claim, the superior court's decision on direct appeal.  (Doc. 12-3, CM/ECF p.

108).  That opinion  adopts the trial court's statement of the facts in the latter's opinion

prepared for the purpose of the direct appeal.  On the instant claim, the superior court

stated the trial court had properly disposed of it where "the jury could properly infer

[Petitioner] had . . . specific intent to kill from [his] statements to others that he was going

to start fire, his admission to others about starting fire, origin of fire in highly flammable

location, [his] knowledge of location of gun powder, [his] knowledge that gas pipe would

be exposed to fire thereby making it likely that explosion would occur, and timing of fire in

early morning when occupants would be asleep."  (*Id.*, CM/ECF pp. 113-114).[10]

>        Petitioner contends this analysis is mistaken because none of this evidence

establishes that the perpetrator knew that Bradley Thompson and his parents were in the

house at the time the fire was set.  Petitioner maintains this knowledge was necessary to

establish he had the specific intent to kill.  He also contends there is no evidence that he

---

[9]    Because only an attempt at homicide was charged here, specific intent is required
even though the homicide provision also mentions a reckless or negligently caused death.  An
attempt requires intent.  *See Commonwealth v. Geathers*, 847 A.2d 730, 734 (Pa. Super. Ct.
2004).

[10]    The only difference from the trial court's opinion is that the trial court stated in
connection with setting the fire in the middle of the night that the occupants were known to be
asleep.  (Doc. 12-3, CM/ECF p. 16).

knew there was gunpowder in the gun room or that there was a gas line leading into the house where the fire was set.

As noted, we have no authority on a section 2254 petition to substitute our own judgment for the one made by the state courts.  We can only grant relief if the state courts' conclusion on this issue was an unreasonable application of Supreme Court precedent.  We do not think it was unreasonable.  We acknowledge that in similar cases when intent to kill was shown by the perpetrator's knowledge that the victims were in the residence, there was direct evidence of this knowledge.  *See Commonwealth v. Williams*, 514 Pa. 124, 128, 136, 522 A.2d 1095, 1097, 1101 (1987)(in an attempted murder case, intent to kill proved by the defendant's state of mind just prior to the fire when he stated that he knew the residents were at home and if they came downstairs he would kill them), *abrogated on other grounds*, *Commonwealth v. Williams*, 521 Pa. 556, 559 A.2d 25 (1989) ; *Commonwealth v. Dougherty*, 580 Pa. 183, 191 n.7, 860 A.2d 31, 35 n.7 (2004)(in a first-degree murder case, specific intent to kill established from setting a residential fire when the defendant had been in the house and knew that children were upstairs sleeping).  Nonetheless, we think fairminded jurists could decide that Petitioner knew the family was in the house from the following facts: (1) he knew the family was using the house as a residence; and (2) the fire was set in the overnight hours when they would be asleep.  From this it follows that Petitioner had the specific intent to kill.  Inferences may be used to establish the elements of a criminal offense if the inferences

more likely than not flow from the facts established.  *Johnson*, *supra*, 2011 WL 4565464,

at *12.[11]

        We thus reject Petitioner's sufficiency-of-the-evidence claim.

      C.  *Trial Counsel Was Not Ineffective in Not Objecting to the Trial Court's Instructions to the Jury on the Basis that the Trial Court Improperly Told the Jury They Could Find Petitioner Guilty of Attempted Homicide Simply Upon a Finding of Malice*

        Petitioner claims trial counsel was ineffective in not objecting to the trial

court's instructions to the jury which improperly told them they could find Petitioner guilty

of homicide simply upon a finding of malice.

        We reject this claim because the trial court did not improperly instruct the

jury.  The trial court did mention malice but also made it clear that the jury had to find a

specific intent to kill for attempted homicide.  As the trial court instructed, in pertinent

part:

> Now, that definition applies both as to attempted homicide and also aggravated assault.  They both have the requirement that malice exist.  The difference between the two is that for attempted homicide, the intent of the Defendant has to be specifically that he intends to kill, not just that death might have resulted.  It has to be his intent.  That's sort of the hallmark of first-degree murder, that you intend to kill somebody.

---

[11]  We also think, at the least, it was a fair inference from the evidence that the perpetrator knew he was setting the fire near a gas line, if not knowing that there was gunpowder in the basement.

Now, if you are attempting murder, by definition, that means you had the intent to kill.  If you are attempting to kill them, you have that intent.  It is another way of saying the same thing.  So, that would be sufficient if death had actually occurred to find a verdict of first-degree murder if you find they had the intent to kill.

But, since death didn't actually happen here, what we're talking about is attempt to kill.  And that can only be proven by the first element of malice that I spoke of, that is that the person had the intent to kill.

. . . .

So, the first requirement would be that the Defendant's conduct was such that he had the specific intent to kill.  And that the person has the specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention. . . .

(*Id.*, CM/ECF pp. 142-45).[12]

       D.  *Trial Counsel Was Not Ineffective in Not Objecting to the Prosecutor's Comments in His Closing Argument When the Prosecutor Argued that Petitioner had Disappeared From His Family and Had Run From the Police*

Petitioner claims trial counsel was ineffective in not objecting when the

prosecutor argued in his closing that Petitioner had disappeared from his family and had

---

[12]    As noted, Petitioner procedurally defaulted his claims that trial counsel was ineffective in not objecting when the trial court: (1) told the jury all four offenses rose or fell upon whether Petitioner set the fire (Doc. 12-2, CM/ECF pp. 140-141); (3) instructed on first-degree murder when Petitioner was not charged with first-degree murder (*id.*, CM/ECF p. 144); and (4) told the jury that the intentional setting of a fire near a dwelling could on its own establish an intent to kill.  (*Id.*, CM/ECF p. 152).  Even though we do not reach the merits of these claims, our examination of the trial court's instructions indicates that the first two instructions were proper and that the third (which more specifically mentioned setting the fire overnight at the residence) was proper in light of our conclusion above dealing with the same issue in the context of Petitioner's sufficiency-of-the-evidence claim.

avoided the police when the record did not support these allegations.  As support for this contention, Petitioner relies on that portion of the record, quoted above, where the prosecutor was cross-examining him about his whereabouts in December 2003.

During cross-examination, the prosecutor attempted to establish that Petitioner had "disappeared," had stopped living at his parents' house at some point in December 2003 after the fire.  Petitioner denied that he had disappeared and said that he had been living with his parents until January 3, 2004, when he moved in with Joshua Lefevre for a few weeks.  The prosecutor was only able to obtain a vague admission that at some point Petitioner's father may have told the police he did not know where Petitioner was, and this was the apparent basis for the prosecutor's argument that Petitioner had disappeared.

As noted by Petitioner, the prosecutor then stated in his closing at least four times that shortly after the fire, Petitioner had disappeared, or ducked and dodged and had even gone on the run.  Petitioner argues this was prosecutorial misconduct since there was no basis in the evidence for these assertions.  They prejudiced Petitioner because there was no direct evidence tying him to the fire and the case turned on credibility determinations.

According to Petitioner, the assertion that he had disappeared unfairly implied consciousness of guilt.  *See Commonwealth v. Harvey*, 514 Pa. 531, 538-39, 526 A.2d 330, 334 (1987)("It is a well-settled rule of law that if a person has reason to know he is wanted in connection with a crime, and proceeds to flee or conceal himself from the

law enforcement authorities, such evasive conduct is evidence of guilt and may form a basis, in connection with other proof, from which guilt may be inferred."), cited in *Johnson*, *supra*, 2011 WL 4565464, at *14 (Chagares, J., dissenting).

In rejecting this claim, the superior court noted that the trial court's overruling of defense counsel's objection indicated that there was some basis in the evidence for the prosecutor's reference to Petitioner's having disappeared.  The court concluded that the prosecutor could "argue all reasonable inferences from the evidence in the record, including Thompson's testimony about his whereabouts after the incident," even though "the repeated use of the 'disappeared" or similar words might have been a stretch . . . ."  (Doc. 12-4, CM/ECF p. 408).  The court also decided, in any event, that if counsel had been ineffective in not objecting to the remarks, Petitioner had not been prejudiced because there was no reasonable probability that the outcome of the proceedings would have been different.  (*Id.*, CM/ECF pp. 408-409).

A prosecutor has "'considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence.'"  *United States v. Lee*, 612 F.3d 170, 194 (3d Cir. 2010)(quoted case omitted).  We agree with the superior court that there was evidence in the record from which the prosecutor could have fairly argued that Petitioner was at least avoiding the police.  For example, in December 2003 Petitioner was not returning phone calls from the police and on January 6, 2004, he avoided the police when they were at Joshua Lefevre's house interviewing the latter.  A prosecutor's remarks create reversible error only if they so infect the trial

with unfairness they violate due process.  *Id.*  The prosecutor's remarks here do not meet

that standard.

We also cannot say that the superior court's other ruling on this issue, that

there was no ineffectiveness because there was no reasonable probability that the

outcome of the proceedings would have been different, was an unreasonable application

of *Strickland*.[13]  The case did turn on credibility determinations, but there was enough

corroborating evidence that the prosecutor's references to Petitioner's disappearance did

not prejudice him.[14]

IV. *Conclusion*

We will issue an order denying the section 2254 petition.  The order will

also deny a certificate of appealability, based on the analysis in this memorandum.

However, Petitioner is advised that he has the right for thirty (30) days to appeal our

order denying his 2254 petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and

---

[13]  *Strickland* sets forth a two-prong test to establish ineffective assistance of counsel. First, counsel's performance must be deficient.  *Jacobs v. Horn,* 395 F.3d 92, 102 (3d Cir. 2005)(citing *Strickland*).  Second, counsel's deficient performance must have prejudiced the defense.  *Id.* (quoting *Strickland*).  A petitioner must "show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Id.* at 105 (quoting *Strickland*).

[14]  As noted, Petitioner procedurally defaulted his claims of ineffectiveness regarding the prosecutor's remarks: (1) that Petitioner was untruthful, and the Commonwealth's witnesses were truthful, based on the amount of eye contact the witnesses made with the jury; and (2) that made an argument that ridiculed defense counsel's knowledge of the facts while attesting to the veracity of the Commonwealth's witnesses.  Even though we do not reach the merits of these claims, our examination of the prosecutor's closing indicates that these remarks (Doc. 12-2, CM/ECF pp. 96-97, 187; Doc.12-2, CM/ECF pp. 109-110), were proper. Hence we would have rejected these claims in any event.

that our denial of a certificate of appealability does not prevent him from doing so, as long as he also seeks a certificate of appealability from the court of appeals.  *See* Federal Rule of Appellate Procedure 22; Local Rule of Appellate Procedure 22.1.


                                        /s/ William W. Caldwell
                                        William W. Caldwell
                                        United States District Judge


Date: February 7, 2012

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS W. THOMPSON, JR.,          :
        Petitioner,          :
                :  CIVIL NO. 1:10-CV-2227
    v.          :
                :  (Judge Caldwell)
DANIEL BURNS, et al.,          :
        Respondents          :

*O R D E R*

AND NOW, this 7th day of February, 2012, it is ordered that:

1.  The petition (Doc. 1) for a writ of habeas corpus under 28 U.S.C. § 2254 is denied.

2.  A certificate of appealability is denied.

3.  The Clerk of Court shall close this file.

                    /s/ William W. Caldwell
                    William W. Caldwell
                    United States District Judge